The judgment of the court was pronounced by
Preston, J.
The plaintiff sues the defendant as the surviving widow of Henry Bonner, to render her responsible for debts due to him by the estate of the deceased. He alleges that she concealed and made way with effects of the community of acquests and gains ; that she intermeddled with the estate of her late husband; that she retained and converted to her own use a portion of the property of the estate, and illegally sold and disposed of a part of its effects.
The husband died in October, 1841; the widow renounced the community of acquests in October, 1842. He left a large property, but greatly involved in debt. With many others in like circumstances, he was deluded into the belief that he was rich, left a will directing that his property should be kept together, and managed to the best advantage, and his debts paid out of the proceeds of the crops, and that his widow should keep the property together until his two grand-children became of age, and divide it between them. He appointed executors, two of whom, Eli M. and William Justice, qualified. His hopes were delusive; his estate is substantially exhausted and has paid but seventy cents on the dollar of his debts.
As the acts upon which the defendant is charged are not specified in the petition, we are led to the conclusion, from the evidence and arguments of counsel, that they consisted in having used and not caused to be sold by the executors: 1. A carriage and pair of horses. 2. A gang of hogs. 3. A stock of cattle.
*630 The testimony leaves no doubt on our minds, that the carriage was a present from her son-in-law to the defendant. His wife having died, leaving two female children, he confided them to the care and affection of their grand-mother, with whom they still live ; and about the same time presented her with the carriage and horses. Bonner returned the horses, saying his son-in-law was unable to make so large a present; but the latter persisted and sent them back, saying the carriage would be of no service to his mother-in-law and children without the horses. Bonner, some months afterwards, sent him four mules, whieh a witness thinks were worth more than the carriage and horses. That may be. Mutual presents are generally the most onerous kinds of exchanges; nevertheless they are presents. The mules appear to have been sent rather to replace the horses than the cairiage; and it is to be observed that one of the hoi'ses died, and the other was given up to be sold by the executors, on their first demand from the widow.
In pursuance of the testamentary direction to work the plantation and pay the debts of the estate out of the proceeds of the crops, the executor’s gathered and inventoried the crop standing at the decease of the testator, and made and gathered another crop for the creditors, as the slaves were not sold until the latter part of January, 1843. Most of the hogs, it is proved, and much of the stock, in all probability, was consumed in securing these two crops for the creditors; and it does not appear that any creditor opposed the course pursued, or that it proved prejudicial to the estate.
The stock of cattle was not concealed by the widow. They, as well as the hogs, were appraised and inventoried, but were not sold by the executors.
Gray, the overseer of the plantation Immediately before Bonner's death, testifies that they were his cattle ; marked with his brand; considered as such on the plantation, and that Mrs. Bonner never pretended to claim them. Dawson and Lasser, witnesses, considered them the cattle of Mr. Bonner.
The defendant used some of these cattle ; and sold fourteen head to Dr. Cruilcshanlcs, picked out of a stock of fifty, and at SI 2 a head. But it appears that the defendant, in good faith, claimed them as her own cattle and paraphernal property. Pollit testifies that Bonner always spoke of the cattle branded H B (the brand the widow claimed,) as belonging to his wife and daughter. William Justice, one of the executors, and Mr. Burney, a brother of the defendant, give a history of the stock and prove that it originated from cattle given to the defendant and her deceased daughter; that Bonner always spoke of them as the stock of his wife and daughter; and Burney further says, that he assisted in branding and delivering the cattle to Dr. Cruilcshanks, and knew them to be the cattle that had belonged to Mrs. Manadieu.
Our impressions are, that the increase of animals inure to the benefit of the community of acquests, and that the stock of cattle, except some which belonged to the grand-children of the defendant, did belong to the community of acquests. And had this case been first presented to us, we might have come to a different conclusion from the jury. But they evidently gave full credit to the testimony of the executor of the husband and brother of the defendant, though subject to objections as to its weight and credibility, and we cannot say the jury erred, supported as their testimony is by that of Pollit.
The defendant, therefore, evidently claimed the carriage, horses and stock in good faith and believing they were her own. It does not, therefore, become absolutely necessary for us to decide, whether they were her paraphernal property, or belonged to the community of acquests between her and her husband. *631 For we concur in the legal points made by the defendant’s counsel: 1st. That the conversion of the property to render the widow liable to the debts of the community must be fraudulent, and done with a view to dispose of, or appropriate to her own use, effects which she knew belonged to the estate. Pothier lays down this principle expressly. Traite de Communauté, No. 552, 553. See also 19 L. R. 505, 506. Vol. 24 Journal du Palais, 746. Ib. vol. 10, p. 205. Paillet Annoté, No. 5, art. 801. If the widow believed the effects to be her own, concealed nothing, meddled with the property only because she thought she had a right to it, she did not thereby render herself liable to the debts of the community. We are of opinion, from the testimony, that Mrs. Bonner concealed nothing; believed she had a right to the carriage horses and stock of cattle so far as they were used by her. Moreover, that she offered no impediment, much less any that was unreasonable to the creditors, heirs or executors of her husband, in taking possession of his estate. She gave up the surviving horse to be sold as soon as demanded; she gave up a watch which she might have thought her own, having been given to her to replace her own, which the husband had lost. She made no opposition to the sale of beds, chairs, tables, carpets, and all kinds of furniture which married ladies often imagine their own. The executor does not doubt that she would have given up the stock she claimed, had he have asked it, but that knowing its origin, and believing that it belonged to her and her grand-children, he did not do so.
If these effects in reality belonged to the estate, the executors are accountable for them ; and it belongs to the creditors to enforce the accountability of the executors. After the renunciation of the community of acquests, the defendant could not even call for an account or exercise any control whatsoever over the executors.
We are of opinion, moreover, that the concealment, conversion, or intermeddling of the widow with the effects of the community, must have taken place before her renunciation of the same, to render her liable for the husband’s debts. The abstraction of effects after her renunciation, subjects her only to the liabilities or penalties to which it would subject any other person. This is a reasonable inference from article 2387 of the code, and is expressly laid down by Duran-ton, vol. 8, p. 219, Nos. 442, 443. If it should be said that she used the carriage and participated in the possession of cattle and hogs during the year before she renounced, this pleasure and their subsistence were very possibly compensated by the services and care an experienced lady, long acquainted with the slaves, might render, especially to the females and children, by her superintendence and advice as to their health, clothing, support, and generally as to their domestic concerns.
The judgment of the district court is therefore affirmed, with costs.